AO 106 (Rev. 01/09) Application for a Search Warrant

# United States District Court
### for the
### Western District of New York

**FILED**
MAY 07 2018
MARY C. LOEWENGUTH, CLERK
UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NY

In the Matter of the Search of
*(Briefly describe the property to be searched or identify the person by name and address.)*

**SAMSUNG MODEL SM0G55DT1, FCC ID: A3LSMG550T**

Case No. 18-M- 44

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

**SAMSUNG MODEL SM0G55DT1, FCC ID: A3LSMG550T,** further described in Exhibit A (attached and incorporated by reference).

located in the Western District of New York, there is now concealed *(identify the person or describe the property to be seized)*:
The items set forth on the attached schedule of items to be seized, attached hereto as Exhibit B and incorporated by reference.

The basis for search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
- ☒ evidence of a crime;
- ☒ contraband, fruits of crime, or other items illegally possessed;
- ☒ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to violations of 21 U.S.C. §§ 841(a)(1) and 846.

The application is based on these facts:

- ☒ continued on the attached sheet.
- ☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

S. R. CORY HIGGINS
Task Force Officer
Drug Enforcement Administration
*Printed name and title*

Sworn to before me and signed in my presence.

Date:  May 7, 2018

_____
*Judge's signature*

City and state:  Buffalo, New York

HON. H. KENNETH SCHROEDER, JR
United States Magistrate Judge
*Printed name and Title*

EXHIBIT A

MODEL  SM-G550T1  UD
FCC ID  A3LSMG550T
SW  G550T1UVU1APF1
HW  REV0 4
FOR INFORMATION CALL 1-800-SAMSUNG

1611

354151/06/616004/4

MADE IN CHINA

SAMSUNG

Please refer to manual before using battery.
Veuillez consulter le guide d'utilisation
avant d'utiliser la pile.
Referez-vous au mode d'emploi
avant d'utiliser la batterie.
Consulte o manual antes de usar a bateria.
Por favor lea el manual antes de utilizar la bateria.

EB-BG530CBU
S/N:  AA2HB05LS/2-B

EXHIBIT A

## EXHIBIT B

1.    All records on the **TARGET TELEPHONE** that relate to violations of 21 U.S.C. § 841 (possession with intent to distribute, and distribution of cocaine base.), 21 U.S.C. § 846 (conspiracy to possess with intent to distribute cocaine base), 21 U.S.C. § 844(a) (possession of cocaine base), and 21 U.S.C. § 843(b) (use of a communication facility in furtherance of a drug felony), including records and contents of:

    a.    lists of co-conspirators, counterparties, and customers, and related identifying information;

    b.    telephone calls, including incoming, outgoing, and missed calls, phone contact addresses, email addresses and telephone numbers in directories, documents and files which reflect names, email addresses, addresses, telephone numbers and objects related to drug trafficking, and photographs regarding drug trafficking and drug trafficking associates contained in the cellular telephones;

    c.    SMS and MMS messages, and any other wire and electronic communications relating to controlled substances and virtual currency;

    d.    types, amounts, and prices of drugs trafficked as well as dates, places, and amounts of specific transactions;

    e.    any information related to sources of drugs (including names, addresses, phone numbers, or any other identifying information);

    f.    any information recording the device's travel,

    g.    all bank records, checks, credit card bills, account information, and other financial records limited to or relating to drug trafficking.

2.      Evidence of user attribution showing who used or owned the Device at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history;

3.      Records evidencing the use of the Internet relating to controlled substances and virtual currencies, including:

a.      records of Internet Protocol addresses used;

b.      records of Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses;

c.      records of any software for and usage regarding the storage and transfer of virtual currencies, including bitcoins.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK

---

IN THE MATTER OF THE APPLICATION FOR
A SEARCH WARRANT AUTHORIZING THE                18-M-
SEARCH OF THE FOLLOWING CELLULAR               **(FILED UNDER SEAL)**
TELEPHONE: SAMSUNG MODEL SM0G55DT1,
FCC ID: A3LSMG550T

---

## AFFIDAVIT IN SUPPORT OF APPLICATION FOR
## SEARCH WARRANTS

STATE OF NEW YORK   )
COUNTY OF ERIE      )      SS:
CITY OF BUFFALO     )

**S.R. CORY HIGGINS**, a Task Force Agent of the Drug Enforcement Administration (DEA), United States Department of Justice, Buffalo, New York, having been duly sworn, states as follows:

1.      I am an "investigative or law enforcement officer of the United States" within the meaning of Section 2510(7) of Title 18, United States Code, that is, a Task Force Officer of the United States who is empowered by law to conduct investigations of and to make arrests for offenses enumerated in Section 2516, Title 18, United States Code. I am currently assigned to the Enforcement Group D-58, which is composed of Special Agents and Local Law Enforcement officers investigating narcotics trafficking. I have been employed as a Task Force Officer for the DEA since December 2000. I have participated in investigations of narcotics trafficking in violation of provisions of Title 21 of the United States Code and,

among other things, have conducted or participated in surveillances, the execution of search warrants, debriefings of confidential sources and reviews of taped conversation. I am familiar with how controlled substances are cultivated, manufactured, processed, packaged, distributed, sold and used within the framework of drug trafficking and how drug traffickers utilize wire communications to facilitate their illegal activities.

2.     Based on my training and experience, I am familiar with the ways in which drug dealers conduct their drug-related business, including, but not limited to (a) their methods of distributing narcotics; (b) methods of distributing drug proceeds; (c) use of telephone communication devices and digital display paging devices; (d) use of numerical codes and code words to identify themselves, the nature of the communication and to conduct their drug-related transactions; and (e) common practice of registering for and obtaining these communication devices under false names, or names of relatives and/or friends to avoid financial responsibilities and tracking of criminal activities by law enforcement entities.

3.     The information within this affidavit is based upon my personal knowledge and observations, as well as information supplied to me by other Special Agents of the DEA, homicide detectives with the Buffalo Police Department, and other law enforcement personnel. Because this affidavit is being submitted for the limited purpose of obtaining a search warrant, I have not included each and every fact known to me concerning this investigation.

4.   Through my training and experience and the training and experience of the other law enforcement officers involved in this investigation, your affiant knows that:

a.   Distributors of narcotics often maintain records both on paper as well as on cellular telephones/mobile electronic devices, pertaining to the sale and/or manufacturing of heroin; and books, records, receipts, notes, ledgers, money orders and other documents and papers reflecting the acquisition, transportation, disposition and distribution of narcotics, controlled substances, proceeds and expenditures of and for those activities;

b.   Narcotics traffickers amass large amounts of currency from the sale of illicit drugs; and

c.   Persons involved in large scale drug trafficking conceal in their residences and businesses caches of drugs, large amounts of currency, financial instruments, precious metals, jewelry, other items of value, and proceeds of drug transactions, and evidence of financial transactions relating to obtaining, transferring, secreting, or spending large sums of money derived from drug trafficking activities.

d.   Persons involved in trafficking heroin often distribute lesser amounts in high frequency to numerous individuals who are addicted to the substance based on the buyers continued need to support their dependency. As such, these individuals utilize cellular telephone(s) to maintain communication with their customer base.

5.   Your Affiant and other Officers and Agents of the United States Drug Enforcement Administration (DEA), have been involved in an investigation regarding the drug trafficking activities of **Derrick WASHINGTON** and others, known and unknown, in violation of Title 21, United States Code Sections 841(a)(1) and 846 (hereinafter "Target Offenses"). I have set forth only the information I believe to be necessary to establish probable cause to obtain a search warrant. I have not included each and every fact known to me concerning this investigation. Facts not set forth herein are not being relied on in reaching

my conclusion that the requested order should be issued. Nor do I request that this Court rely on any facts not set forth herein in reviewing this application.

6.    Probable cause exits to believe that the search warrant of **Samsung Model SM0G55DT1 FCC ID: A3LSMG550T cellular telephone** utilizing telephone number **(716) 381-0726 (hereinafter "Target Telephone"),**[1] will lead to evidence against **Derrick WASHINGTON**, who is involved in the trafficking of large quantities of cocaine base, a Schedule II controlled substance, in violation of Title 21, United States Code Sections 841(a)(1) and 846 (unlawful distribution of controlled substances and conspiracy to commit same) ( the "Target Offenses"), as well as the identification of individuals who are engaged in the commission of these offenses.

7.    For the reasons set out in the affidavit, there is probable cause to believe that the **Target Telephone** was used to facilitate the commission of the Target Offenses, which have been committed by an individual now known to your affiant as **Derrick WASHINGTON**. Further, there is probable cause to believe that **WASHINGTON** was using and carrying the **Target Telephone** while committing the Target Offenses.

---

[1] According to records obtained by T-Mobile USA, (716) 381-0726 is subscribed to by DERRICK WISE at 545 Best Street, Buffalo, New York 14208. Although this cellular device is not subscribed to DERRICK WASHINGTON, your affiant understands that it is common for individuals utilizing cellular telephones in furtherance of the distribution of narcotics to use fictitious names and addresses when purchasing these cellular devices in an effort to evade law enforcement detection.

8.     This affidavit is made in support of search warrant for **Samsung Model SM0G55DT1 FCC ID: A3LSMG550T cellular telephone** utilizing telephone number **(716) 381-0726.**

## BACKGROUND OF THE INVESTIGATION

9.     Beginning in November of 2017, members of the DEA Task Force (hereinafter "the investigative team") began conducting an investigation into the drug-trafficking activities of **Derrick WASHINGTON**'s Drug Trafficking Organization (hereinafter "DTO"). Specifically, Agents identified **WASHINGTON**, as an individual engaged in the distribution of crack cocaine in and around Buffalo, NY.   During this investigation, Agents have conducted controlled cocaine base purchases from **Derrick WASHINGTON**, on three separate occasions over two-month period utilizing an undercover officer (hereinafter referred to as UC). These controlled purchases were facilitated and negotiated between the UC and **WASHINGTON** over the **Target Telephone.**

## JANUARY 22, 2018 UNDERCOVER PURCHASE OF APPROXIMATELY 1 OUNCE OF COCAINE BASE FROM DERRICK WASHINGTON

10.     On January 19, 2018, the investigative team members utilized the UC to contact the **Target Telephone**.   The initial calls from the UC to the **Target Telephone** on January 19, 2018 were not answered.   A short time later, on January 19, 2018, the UC received an incoming phone call from the Target Telephone.   During the call, the UC and **WASHINGTON** engaged in a narcotics-related conversation, after which, they agreed to speak again in the near future.

11.     On January 22, 2018, investigative team members met at the DEA office. The purpose of the meeting was to formulate plans to conduct a controlled purchase of one (1) ounce of cocaine base from **WASHINGTON.**

12.     At approximately 12:52 p.m., the UC contacted **WASHINGTON** via text message over the **Target Telephone** regarding the purchase of one (1) ounce of cocaine base. After missing an incoming call from **WASHINGTON**, the UC made a consensually recorded phone call to **WASHINGTON** on the **Target Telephone** at approximately 1:09 p.m. During this conversation, the UC made arrangements to meet with **WASHINGTON** in the parking lot of Save-A-Lot store located at 142 Grant Street in Buffalo, New York to conduct this transaction.

13.     Members of the investigative team then established surveillance in the area of the Save-A-Lot Store located at 142 Grant Street, Buffalo, New York to monitor this transaction.  At approximately 1:25 p.m., the UC, while under observation of surveillance units, departed the DEA Office and proceeded to the parking lot of Save-A-Lot on Grant Street, Buffalo, New York.  The UC was provided with $1,400.00 in United States currency.

14.     At approximately 1:35 p.m., the UC pulled into the parking lot of Save-A-Lot. At the same time, TFOs Milkowski and Schilling observed a Red Dodge Journey, bearing Florida registration CICZ12, pulling into the parking lot of the Save-A-Lot. According to database checks, this vehicle appears to have been registered to Rental P.V. Holding Corp.,

located in Orlando, Florida. However, the vehicle appears to have been rented to **ELLA ANDERSON**, DOB: 07-20-1975, 696 LaSalle Avenue, Buffalo, New York.

15.     TFOs Milkowski and Schilling then observed **Derrick WASHINGTON** exit the front passenger side of the Red Dodge Journey.  Surveillance units also observed an unidentified black female[2] seated in the driver side seat. TFOs Milkowski and Schilling observed **WASHINGTON** walked to the UC's vehicle and sat in the front passenger seat. While in the UC's vehicle, the UC engaged **WASHINGTON** in narcotics-related conversation. The UC subsequently conducted the transaction with **WASHINGTON**, obtaining one (1) ounce of cocaine base in exchange for $1,400.00 in DEA funds.

16.     At approximately 1:40 p.m., **WASHINGTON** exit the UC's vehicle and enter the Red Dodge Journey driven by **Ella ANDERSON**.   Both **ANDERSON** and **WASHINGTON** then departed the meet location.   The UC, still under surveillance, immediately left the area and then turned over two (2) plastic bags of suspected cocaine base to the investigative team at the DEA Office.

17.     The cocaine base purchased from **WASHINGTON** during this transaction was submitted to the DEA Northeast Regional Laboratory (NERL) for analysis and laboratory analysis confirmed the presence of cocaine base.

---

[2] Members of the investigative team later confirmed that the unidentified black female to be was ELLA ANDERSON after viewing a booking photograph of ANDERSON following the operation.

18.     Members of the investigative team continued surveillance of **WASHINGTON** after the transaction.     During the surveillance, agents observed **ANDERSON** take **WASHINGTON** to his gray Buick LeSabre bearing NYS registration HTG8782, which was parked on Breckenridge Street.  **WASHINGTON** entered this vehicle and was followed directly from Breckenridge Street to his residence identified as 74 Grimes Street, Upper, Buffalo, New York.

## JANUARY 30, 2018 UNDERCOVER PURCHASE OF APPROXIMATELY 1 OUNCE OF COCAINE BASE FROM DERRICK WASHINGTON

19.     On January 30, 2018, members of the investigative team met at the DEA Office for the purpose of conducting a UC controlled purchase of approximately one (1) ounce of cocaine base from **WASHINGTON** for $1,400.00 in DEA funds.

20.     On January 30, 2018, at approximately 12:46 p.m., members of the investigative team established surveillance in the area of **WASHINGTON**'s residence at 74 Grimes Street, Buffalo, New York.   However, members of the investigative team observed that **WASHINGTON**'s vehicle was not present at 74 Grimes Street. At approximately 1:23 p.m., the UC made a call to **WASHINGTON** over the **Target Telephone**, which went unanswered. At approximately 1:26 p.m., the surveillance team, including your affiant, observed **WASHINGTON** operating a gray Buick LeSabre and arriving at 74 Grimes Street, Buffalo, New York.

21.     On Tuesday, January 30, 2018, starting at approximately 1:36 p.m., the UC and **WASHINGTON** engaged text messages over the **Target Telephone** regarding the purchase of one (1) ounce of cocaine base.

**Undercover Officer** (hereinafter known as UC) – "U around?"

**UC**- "Yo"

**Target Telephone** (hereinafter known as TT) – "Whats's good?"

**UC**- "Same how long"

**TT** – "U in Buffalo"

**UC** – "No but I can be on grant in bout 20"

**TT** – "Ok give me a half and hr"

22.     **WASHINGTON** and the UC decided to meet in the parking lot of Save-A-Lot Store located at 142 Grant Street, Buffalo, New York. Upon learning the expected buy location, surveillance units were established in that vicinity.

23.     At approximately 1:39 p.m., TFO Zimniewicz observed **WASHINGTON** exit his home located at 74 Grimes Street, Buffalo, New York and enter his above-described gray Buick LeSabre. The investigative team maintained surveillance on **WASHINGTON** as he proceeded from 74 Grimes Street, Buffalo, New York to 497 Northland Avenue, Buffalo, New York, where Agent Gentile observed **WASHINGTON** exit his vehicle and enter the residence.

24.     At approximately 1:52 p.m., the UC departed the DEA Office and proceeded to 142 Grant Street, Buffalo, New York.  While in transit to the meet location, the UC received a text message from the **Target Telephone** sent by **WASHINGTON** saying that he had "Only soft."[3]

25.     At approximately 1:59 p.m., the UC placed an outgoing call to **WASHINGTON** and engaged in conversation regarding the cocaine base transaction. During this conversation, UC received a text message for the **Target Telephone** sent by **WASHINGTON** saying that "I have to cook it up" (which is a method to manufacture cocaine base) and told the UC to wait while **WASHINGTON** prepared the crack cocaine.

26.     At approximately 2:03 p.m., SA Gentile observed **WASHINGTON** exit 497 Northland Avenue, Buffalo, New York and enter his gray Buick LeSabre.  Surveillance units followed **WASHINGTON** from Northland Avenue directly to the M&T Bank parking lot located on Grant Street next to the Save-A-Lot.  TFO Schilling then observed **WASHINGTON** park in the M&T Bank parking lot and remain in his vehicle.  At approximately 2:18 p.m., the UC received an incoming text message from **WASHINGTON** in which **WASHINGTON** stated he would be at the meet location in 5 to 10 minutes.

27.     At approximately 2:23 p.m., your affiant and TFO McMahon observed a Maroon Jeep Cherokee being operated by an **ELLA ANDERSON** pulled into the M&T Bank

---

[3] Based on your affiant's training and experience, "Soft" is a reference to powder cocaine, not cocaine base.

parking lot located next to the Save-A-Lot store parking lot. The Maroon Jeep Cherokee being operated by an **Ella ANDERSON** pulled next to **WASHINGTON**'s vehicle. At which time, your affiant and TFO McMahon observed **WASHINGTON** exit his vehicle and enter the front passenger side of said Maroon Jeep Cherokee. The Jeep Cherokee then pulled out of the M&T parking lot and drove directly to the Save-A-Lot store parking lot located next door.

28.     At approximately 2:24 p.m., TFO Schilling observed **WASHINGTON** exit the front passenger side of the Jeep Cherokee and walk over to the UC vehicle and enter the front passenger side of the UC's vehicle. The UC and **WASHINGTON** then engaged in narcotics-related conversation. The UC subsequently conducted the transaction with **WASHINGTON**, obtaining one (1) ounce of cocaine base in exchange for $1,400.00 in DEA funds. During the exchange between the UC and **WASHINGTON**, the UC informed **WASHINGTON** that the package was short and **WASHINGTON** placed an outgoing call on the **Target Telephone,** and the UC heard **WASHINGTON** say "Honey did you give me the right bag?"

29.     At approximately 2:29 PM, the transaction was completed and **WASHINGTON** was observed exiting the UC's vehicle by TFO Calloway. TFO Calloway then observed **WASHINGTON** walk directly to the Jeep Cherokee and enter the front passenger side. The Jeep then proceeded directly to **WASHINGTON**'s vehicle which was still parked at the M&T Bank parking lot and your affiant observed **WASHINGTON** exit the

front passenger side of the Jeep Cherokee and enter his gray Buick LeSabre. Your affiant maintained surveillance of **WASHINGTON** until such time that the UC was out of the area.

30.     The UC was then observed departing the area and drove directly to the Buffalo DEA Office where he turned over one (1) plastic bag containing suspected cocaine base to TFO Higgins. The cocaine base purchased from **WASHINGTON** during this transaction was submitted to the DEA Northeast Regional Laboratory (NERL) for analysis and laboratory analysis confirmed the presence of cocaine base.

### FEBRUARY 6, 2018 UNDERCOVER PURCHASE OF APPROXIMATELY 1 OUNCE OF COCAINE BASE AND HEROIN FROM DERRICK WASHINGTON

31.     On February 6, 2018, members of the investigative team met with the UC at the DEA Office. The purpose of this meeting was to formulate plans to conduct a controlled purchase of one (1) ounce of cocaine base from **WASHINGTON**.

32.     At approximately 10:40 a.m., your affiant along with SA David Walters, SA Mark Gentile and TFO Clinton Calloway established surveillance in the area of **WASHINGTON**'s residence located at 74 Grimes Street, Buffalo, New York. A surveillance unit was also established in the vicinity of 1502 Niagara Street, Buffalo, New York, which had been identified as the residence utilized by **ELLA ANDERSON**.

33.     At approximately 11:00 a.m., your affiant observed **WASHINGTON**'s gray Buick LeSabre parked on Grimes Street directly across from 74 Grimes Street.   At approximately 11:04 a.m., the UC sent an outgoing text message to **WASHINGTON**.  The

12

UC was communicating with **WASHINGTON** over the **Target Telephone**. During subsequent text message exchanges between the UC and **WASHINGTON**, they decided to meet at noon in the parking lot of Save-A-Lot Store located at 142 Grant Street, Buffalo, New York.

34.     At approximately 11:48 a.m., SA Walters observed **WASHINGTON** exit 74 Grimes Street and enter his gray Buick LeSabre. At approximately 12:01 p.m., the UC missed an incoming call from WASHINGTON. The UC then called **WASHINGTON** back and **WASHINGTON** told the UC that he was on the way. During this time, **WASHINGTON** was surveilled from 74 Grimes Street to the West Side of Buffalo where **WASHINGTON** was observed turning down Livingston Street. Agents were unable to maintain surveillance on **WASHINGTON** due to traffic and temporarily lost visual contact of **WASHINGTON** at approximately 12:07 p.m. At approximately 12:09 p.m., SA Ryan reacquired surveillance of **WASHINGTON** on Congress Street near the Save-A-Lot Store. Your affiant observed **WASHINGTON** drove onto the M&T parking lot on Grant Street next to the Save-A-Lot parking lot where your affiant observed **WASHINGTON** park his vehicle and remain in the front driver's seat.

35.     At approximately 12:23 p.m., the UC arrived and entered the parking lot of the Save-A-Lot store located on Grant Street as observed by your affiant. At approximately 12:24 p.m., TFO Shumaker observed a Maroon Jeep Grand Cherokee pulling into the M&T Bank parking lot, and then observed **WASHINGTON** exit his vehicle and enter the Jeep Cherokee. Your affiant then observed the Maroon Jeep Cherokee being operated by **ANDERSON**. The

Maroon Jeep then pulled out of the M&T Bank parking lot and drove directly to the Save-A-Lot parking lot.

36.     At approximately 12:24 p.m., SA Gentile observed **WASHINGTON** exit the Maroon Jeep Grand Cherokee and walk over to the UC's vehicle. **WASHINGTON** was then observed entering the front passenger side of the UC's vehicle. While in UC's vehicle, the UC and engaged **WASHINGTON** in narcotics-related conversation.   The UC subsequently conducted the transaction with **WASHINGTON**, obtaining one (1) ounce of cocaine base in exchange for $1,400.00 DEA funds.

37.     During   the   transaction   between   the   UC   and   **WASHINGTON,** **WASHINGTON** also provided the UC with one (1) gram sample of heroin as part of an agreement between the UC and **WASHINGTON** for **WASHINGTON** to start selling heroin to the UC on a regular basis in addition to the cocaine base.

38.     At approximately 12:29 p.m., the transaction was completed and **WASHINGTON** exited the UC's vehicle, walked directly to the Marron Jeep Cherokee and entered the front passenger side. The Jeep Cherokee then drove directly to **WASHINGTON's** vehicle, which remained parked at the M&T Bank parking lot.   **WASHINGTON** then exit the Jeep Cherokee and enter his own vehicle.

39.     At approximately 12:29 p.m., the UC was then observed departing the area and then drove directly to the Buffalo DEA Office where he turned over one (1) plastic bag

containing suspected cocaine base and a second bag containing suspected heroin. The suspected cocaine purchased from **WASHINGTON** during this investigation was submitted to the DEA Northeast Regional Laboratory (NERL) for analysis and laboratory analysis confirmed the presence of cocaine base. In addition, laboratory analysis confirmed that the sample one (1) gram of heroin provided by **WASHINGTON** was Fentanyl.

### FEBRUARY 14, 2018 ARREST OF WASHINGTON AND ANDERSON

40.     On February 13, 2018, Honorable United States Magistrate Judge H. Kenneth Schroeder on February 13, 2018 signed search warrants authorizing a search of **WASHINGTON**'s residence at 74 Grimes Street, Upper, Buffalo, New York; **ANDERSON**'s residence at 1052 Niagara Street, Apt. 302, Buffalo, New York; **WASHINGTON**'s Buick LeSabre and **ANDERSON**'s Red Jeep Cherokee.

41.     On February 14, 2018, at approximately 9:50 a.m., members of the investigative team met at the DEA Office for the purpose of the executing the above- described warrants. Shortly thereafter, the UC and **WASHINGTON** engaged in text message communications on the **Target Telephone**. The UC agreed to purchase two (2) ounces of cocaine base from **WASHINGTON** for $2,700.00 and both agreed to meet in the M&T parking lot located on Grant Street, Buffalo, New York next to the parking lot of Save-A-Lot located at 142 Grant Street, Buffalo, New York.

42.     At approximately 10:25 a.m., the surveillance units established surveillance in the areas of 74 Grimes Street and at the M&T parking lot on Grant Street, Buffalo. **WASHINGTON**'s Buick LeSabre was not present at 74 Grimes Street at that time.

43.     During continuous text message communication between **WASHINGTON** and the UC, the two agreed to meet at noon to conduct the transaction. At approximately 11:57 PM, TFO Dan Forsberg observed **ANDERSON**'s Maroon Jeep Cherokee arrive and park in the parking lot of 1502 Niagara Street. At approximately 11:59 AM, TFO Kevin Schilling observed **ANDERSON** enter the front entrance door to 1502 Niagara Street. At approximately 12:08 p.m., GS James McHugh observed **ANDERSON** enter the Maroon Jeep Cherokee and proceed southbound on Niagara Street turning east onto Lafayette. GS McHugh maintained surveillance on **ANDERSON**.

44.     At approximately 12:13 PM, TFO McMahon observed **ANDERSON**'s Jeep Cherokee arrive at the area of Chenango and West Ferry Street where TFO McMahon observed **WASHINGTON** enter the front passenger seat of **ANDERSON**'s Jeep Cherokee. TFO McMahon also observed **WASHINGTON**'s Buick LeSabre parked on West Ferry Street near Chenango. At approximately 12:14 PM, the investigative team maintained surveillance on **WASHINGTON** and **ANDERSON** as they proceeded from the area of West Ferry Street and Chenango to the M&T parking lot on Grant Street a short time later. Upon entering the M&T parking lot, members of the Erie County Tactical Team along with members of the investigative team approached **ANDERSON**'s Jeep Cherokee and placed both **ANDERSON** and **WASHINGTON** under arrest without incident at approximately

12:15 PM. A search of **ANDERSON**'s Jeep Cherokee resulted with negative results for contraband although a NFTA K-9 alerted on a purse on the back seat of stated vehicle. A post-arrest search of **WASHINGTON** resulted in the seizure of 97.46 grams of suspected cocaine base from **WASHINGTON**'s jacket pocket by your affiant. The suspected cocaine base recovered from **WASHINGTON** during his arrest was submitted to the DEA Northeast Regional Laboratory (NERL) for analysis and laboratory analysis confirmed the presence of cocaine base.

45.     During the arrest of **WASHINGTON** and **ANDERSON**, members of the investigative team did seize two (2) cellular phones from within the stated Jeep Cherokee as evidence. One Apple iPhone which was claimed by **ANDERSON** and one Samsung cellular phone belonging to **Derrick WASHINGTON**, which is the Target Telephone and has been in continuous DEA custody since the date of **WASHINGTON's** arrest.

46.     At approximately 12:31 PM, **ANDERSON** was transported to the area of 1502 Niagara Street by a Niagara Frontier Transportation Authority (NFTA) marked unit where members of the investigative team then executed the federal search warrant on 1502 Niagara Street, Apt. 302. As a result, the investigative team seized 123.33 grams of suspected cocaine base, two digital scales and a semi-automatic assault rifle.

47.     All of the cocaine exhibits purchased from **WASHINGTON** during this entire investigation have been submitted to the DEA Northeast Regional Laboratory (NERL) for

analysis and safekeeping.  Analysis of those exhibits has been completed and tested positive

for the presence of cocaine base and Fentanyl.

48.     On February 15, 2018, **WASHINGTON** was brought before the Western

District of New York Federal Magistrate H. Kenneth Schroeder and was charged in

Violations of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(c).

49.     In March of 2018, **WASHINGTON** was indicted on multiple counts in

Violations of Title 21, United States Code, Sections 841(a)(1), 841(b)(1)(c) and 846. **ELLA**

**ANDERSON** was also indicted on multiple counts in Violation of Title 21, United States

Code, Sections 841(a)(1), 841(b)(1)(c), 846 and 856(a)(1) and Title 18, United States Code,

Sections 924(c)(1)(A)(i), 922(g)(1) and 924(a)(2).

## SUMMARY OF RELEVANT TECHNOLOGY

50.     A cellular telephone or mobile telephone is a handheld wireless device used

primarily for voice communication through radio signals.  These telephones send signals

through networks of transmitter/receivers called "cells", enabling communication with other

cellular telephones or traditional "land line" telephones. A cellular telephone usually includes

a "call log", which records the telephone number, date, and time of calls made to and from

the phone.

51.     In addition to enabling voice communications, cellular telephones offer a broad

range of capabilities.  These capabilities include, but are not limited to: storing names and

phone numbers in electronic "address books"; sending, receiving, and storing text messages and email; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Cellular telephones may also include global positioning system ("GPS") technology for determining the location of the device. Based on your Affiant's training and experience, and the information learned throughout this investigation, it is known that persons associated with drug trafficking organizations in general, and **WASHINGTON,** specifically, utilize the cellular telephones to communicate with others about the possession, transportation, and distribution of controlled substances, including cocaine.

### SEEKING AUTHORIZATION TO SEARCH AND SEIZE

52.     Accordingly, the application seeks authorization to search for and seize all:

a.     Records of telephone calls, including incoming, outgoing, and missed calls, phone contact addresses, email addresses and telephone numbers in directories, documents and files which reflect names, email addresses, addresses, telephone numbers and objects related to drug trafficking, and photographs regarding drug trafficking and drug trafficking associates contained in the cellular telephones;

b.     Text messages and emails contained in the cellular telephones limited to or relating to drug trafficking; and

c.     Records regarding the ownership and/or possession of the searched items.

53.     Based on my training, my experience, my participation in other narcotics investigations, my participation in this investigation, and my discussions with other experienced law enforcement personnel, I have learned that significant narcotics traffickers

such as dealers in large quantities of cocaine base and other controlled substances frequently maintain, in portable mobile communication and storage devices, addresses, email addresses and telephone numbers in directories, documents and files which reflect names, email addresses, addresses, telephone numbers, and objects related to drug trafficking, and photographs regarding drug trafficking and drug trafficking associates contained in cellular telephones.

54. Based on your Affiant's experience, it is believed the **Target Telephone** is evidence of and/or contains evidence of the Target Offenses. It is likely that **WASHINGTON** utilized the **Target Telephone** device to contact cocaine suppliers and co-conspirators regarding cocaine deals. As such, I believe that the **Target Telephone** described above contains evidence of the Target Offenses, which have been committed by **WASHINGTON** and others.

55. Based on your Affiant's knowledge and training and the experience of other Agents with whom I have discussed this investigation, I know that in order to completely and accurately retrieve data maintained in cellular telephones hardware or software, to ensure the accuracy and completeness of such data, and to prevent the loss of the data either from accidental or intentional destruction, it is often necessary that the cellular telephones, related instructions in the form of manuals and notes, as well as the software utilized to operate such a device, be seized and subsequently processed by a qualified specialist in a laboratory setting.

## ANALYSIS OF ELECTRONIC DATA

56.     Searching the cellular telephones for the evidence described above may require a range of data analysis techniques.  In some cases, it is possible for Agents to conduct carefully targeted searches that can locate evidence without requiring a time-consuming manual search through unrelated materials that may be commingled with criminal evidence. For example, Agents may be able to execute a "keyword" search that searches through the files stored in a cellular telephone for special words that are likely to appear only in the materials covered in the warrant by looking for particular directory or file names.  In other cases, however, such techniques may not yield the evidence described in the warrant. Suspected criminals have the ability to mislabel or hide information and directories; encode communications to avoid using key words, attempt to delete files to evade detection; or take other steps designed to frustrate law enforcement searches for information.  These steps may require Agents to conduct more extensive searches, such as scanning areas of the device's memory not allocated to listed files, or opening every file and scanning its contents briefly to determine whether it falls within the scope of the warrant.  In light of these difficulties, your Affiant requests permission to use whatever data analysis techniques appear necessary to locate and retrieve the evidence described above.

**WHEREFORE**, based upon the foregoing, your Affiant submits that there is probable cause to believe that the previously described **Target Telephone** is evidence of, and/or

contain evidence of the Target Offenses, and/or evidence of other co-conspirators involved

in the Target Offenses, which have been and continue to be committed.


S.R. CORY HIGGINS.
Task Force Officer
Drug Enforcement Administration


Subscribed and sworn to before me

this _____ day of May, 2018.


HONORABLE KENNETH SCHROEDER, JR.
United States Magistrate Judge

22